**MATSON NAVIGATION COMPANY,**
Petitioner,

v.

**FEDERAL MARITIME COMMISSION**
and United States of America,
Respondents.

No. 22604.

United States Court of Appeals
Ninth Circuit.

Dec. 18, 1968.

Alvin J. Rockwell (argued), John E. Sparks, Thomas A. Welch, of Brobeck, Phleger & Harrison; Willis R. Deming, David F. Anderson, San Francisco, Cal., for petitioner.

Donald F. Turner, Asst. Atty. Gen., Irwin A. Seibel (argued), Howard E. Shapiro, Attys., Dept. of Justice, Robert N. Katz, Solicitor, (argued), FMC, Ramsey Clark, Atty. Gen. of the U. S. Washington, D. C., for respondents.

Warner W. Gardner, Benjamin W. Boley, Washington, D. C., for intervening appellees.

Before MERRILL and CARTER, Circuit Judges, and WHELAN, District Judge.*

MERRILL, Circuit Judge:

Matson Navigation Company has petitioned this court for review of an order and decision of the Federal Maritime Commission in docket No. 66–45, Agreement for consolidation or merger between American Mail Line, Limited, American President Lines, Limited, and Pacific Far East Lines, Inc. Matson seeks by review to have that order and decision set aside and suspended.[1]

By the order under challenge the Commission, acting under § 15 of the Shipping Act of 1916, 46 U.S.C. § 814,[2] ap-

---

\* Honorable FRANCIS C. WHELAN, United States District Judge for the Central District of California, sitting by designation.

1. This court has jurisdiction to review the order under 28 U.S.C. § 2342. Venue is properly laid in the Ninth Circuit pursuant to 28 U.S.C. § 2343, providing for venue in the circuit where the petitioner resides or has its principal place of business.

2. "Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating rates or fares; giving or receiving special rates, accommodations, or other priv-

proved the merger of the three named steamship lines. Those lines have intervened in the proceedings before us in support of the Commission's order. Matson, a competitor of the three lines in the Far East trade, intervened in the proceedings before the Commission, contending that the Commission lacked jurisdiction under § 15 to approve a merger, attacking the agreement as lacking in finality, and also presenting arguments opposing the merger on the merits. It renews its contentions in all respects on this review. The United States, statutory respondent under 28 U.S.C. § 2344, joins Matson in urging that the Commission was without jurisdiction but takes no position in other respects.

### Matson's Standing to Seek Review

The intervening lines contend that Matson is not aggrieved by the Commission's order and therefore has no standing to seek review.

The primary effect of the merger will be felt in shipping between the Pacific Coast and the Far East, in which the merged lines would operate. Matson presently has some operations in this trade and is planning to increase its operations.

■ The Commission found that Matson would suffer no injury as a result of the merger but would face greater

competition. This is sufficient to give standing. FCC v. National Broadcasting Co. (KOA), 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943); Scripps-Howard Radio v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). Further, if the Commission has power under § 15 to approve the agreement, the result would be to immunize the merger from the provisions of the antitrust laws, and Matson could never attack it in the future should injury later result. Sun-Shine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 401–404, 60 S.Ct. 907, 84 L.Ed. 1263 (1940).

We conclude that Matson has standing to seek review.

### Jurisdiction of the FMC Over Merger Agreements

The question is whether the Commission's authority under § 15 to approve (and thereby except from the provisions of the antitrust laws) agreements "regulating, preventing or destroying competition" includes authority to approve mergers. Matson, supported by the United States, contends it does not.

Matson's contentions focus on the fact that antitrust exemption may flow from such an exercise of jurisdiction. It argues that repeal of the antitrust

ileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. * * *

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, ex-

porters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations. * * *

* * * * *

Every agreement, modification, or cancellation lawful under this section * * * shall be excepted from the provisions of sections 1–11 and 15 of this Title 15, and amendments and Acts supplementary thereto. [Sherman and Clayton Acts]"

laws by implication is not favored;[3] that merger jurisdiction is not expressly conferred by § 15,[4] and that Congress intended by that section to render mergers unnecessary and thus to avoid them;[5] that if merger jurisdiction is conferred it is incompletely and insufficiently conferred;[6] that § 15 can rationally be construed as confined to working agreements subject to continuing supervision of the Commission where the agreeing parties continue to exist as entities subject to supervision.[7]

■ Matson's focus upon the fact that antitrust immunization may result is misdirected. In Volkswagenwerk v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L. Ed.2d 1090 (1968), the Court held in no uncertain terms that that fact is no justification for a narrow reading of the authority broadly conferred by § 15; that the public antitrust policy is adequately protected by the consideration given to it by the Commission in reaching its decision as to whether or not to approve the agreement.

The Court, in *Volkswagenwerk,* stated:

> "The Commission thus took an extremely narrow view of a statute that uses expansive language. In support of that view, the Commission argued in this Court that a narrow construction of § 15 should be adopted in order

3. Matson cites United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); California v. FPC, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); Maryland and Virginia Milk Producers' Ass'n v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). In these cases the grant of agency authority to approve agreements did not expressly provide that approval would immunize the arrangements from the antitrust laws. The Court refused to find an implied immunization. In the case before us § 15 expressly provides for immunity.

4. Matson points out that the word "merger" is used in those statutes giving merger authority to the ICC (§ 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2)), the CAB (§ 408 of the Federal Aviation Act, 49 U.S.C. § 1378), and the FCC (§ 221 of the Federal Communications Act, 47 U.S.C. § 221); that the statutes there specify the guidelines to be followed in considering whether mergers should be approved; and that to find merger jurisdiction without an express grant is, of necessity, to find it unrestricted and unaided by any statutory guidelines.

   The guidelines by which an agreement "regulating, preventing or destroying competition" is to be judged (see footnote 2, supra) are, however, as specific or more so than the guidelines given to the CAB (public interest, creation of a monopoly restraining competition or jeopardizing a carrier) and to the FCC (public interest, advantage to users).

5. The "Alexander Report" (House Committee on Merchant Marine and Fisheries, Report on Steamship Agreements and affiliations, H.R.Doc. No. 805, 63d Cong., 2d Sess., 415–424) states, at page 416:

   > "To terminate existing agreements would necessarily bring about one of two results: the lines would either engage in rate wars which would mean the elimination of the weak and survival of the strong, or, to avoid a costly struggle, they would consolidate through common ownership. Neither result can be prevented by legislation, and either would mean a monopoly as fully as effective, and it is believed more so, than can exist by virtue of an agreement."

6. It would cover only mergers accomplished by agreement and not those resulting from stock acquisitions from private parties. Further the Commission has disclaimed authority over mergers of foreign lines.

7. The section lists seven categories of agreements, the seventh being agreements "in any manner providing for an exclusive preferential or co-operative working arrangement." Matson reasons that this is a catchall and that it must mean that the preceding six categories are also forms of "working arrangements." A merger, it is argued, would be an anomaly. Once accomplished, nothing remains for supervision. No power of divestiture is conferred upon the Commission. The Supreme Court in Volkswagenwerk v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), rejected reasoning of this sort as a basis for narrowly construing the broad language of the Act. 390 U.S. at 273–275 & n. 23, 88 S.Ct. 929.

to minimize the number of agreements that may receive antitrust exemption. However, antitrust exemption results not when an agreement is submitted for filing, but only when the agreement is actually approved; and in deciding whether to approve an agreement, the Commission is required under § 15 to consider antitrust implications." 390 U.S. at pages 273–274, 88 S.Ct. at page 936.

The focus, then, is not upon the possibility that immunization may result, but upon the nature of the agreement itself. The question is whether it is the sort of agreement that should, under § 15, have Commission approval, or, conversely, whether it is the sort that water carriers should have power to reach free from Commission scrutiny.

As to the sort of agreement covered by the section, the Court in *Volkswagenwerk* gave the section the broadest of readings. After noting that "the genesis of the Shipping Act was the 'Alexander Report' in 1914" (see footnote 5, supra), the Court stated:

"The Committee recommended, among other things:

'That all carriers engaged in the foreign trade of the United States, parties to any agreements, understandings, or conference arrangements hereinafter referred to, be required to file for approval * * * a copy of all written agreements (or a complete memorandum if the understanding or agreement is oral) entered into (1) with any other steamship companies, firms, or lines engaged directly or indirectly in the American trade, or (2) with American shippers, railroads or other transportation agencies.' Alexander Report, at 419–20.

Nothing in the legislative history suggests that Congress in enacting § 15 of the Act, meant to do less than follow this recommendation of the Alexander Report and subject to the scrutiny of a specialized government agency the myriad of restrictive agreements in the maritime industry." 390 U.S. at page 276, 88 S.Ct. at page 937.

While *Volkswagenwerk* did not deal with a merger agreement, its holding applies to such agreements with rational force. The direct and destructive impact upon competition which may result from a merger renders it the kind of arrangement as to which expert scrutiny most clearly is to be desired. On the other hand, to leave enforcement of antitrust policy in such cases to the FTC, the Department of Justice and the courts would apply the full and unconditional force of the antitrust laws to such agreements contrary to the intent of the Shipping Act that industry considerations must be taken into balance in judging industry arrangements.

■ We conclude that the Commission has jurisdiction under § 15 to approve merger agreements.

### Finality of the Agreement

Matson advances an argument that, as we view it, also attacks the jurisdiction of the Commission to approve the agreement in question.

■ While the Commission order purported to be final approval of the merger, the agreement to which the order was directed was not in any proper sense a merger agreement. The parties simply agreed to agree.

"AML, APL and PFEL, accordingly, hereby agree either to merge or consolidate into a single corporation, of which at least AML would be a separate division for steamship operations, or to merge or consolidate APL and PFEL into a single corporation with AML as a subsidiary, in the form and by the procedures as the directors and stockholders of the three companies should approve."

The Commission thus cast its official approval and the mantle of antitrust immunity over whatever arrangements the lines might come up with. Matson contends that this is not consistent with the intent of § 15. We agree.

■ Matson's focus on antitrust immunity, which we rejected in our discussion of the Commission's jurisdiction to approve mergers, is proper here. It is the resulting merger arrangement itself that will, by virtue of Commission approval, ultimately enjoy immunity, perhaps beyond reach of any governmental power of divestiture.[8] The Commission approval must, then, be directed to that arrangement itself. The Commission here has done no more than consent that the three companies involved proceed to work out an arrangement. This is not a sufficient discharge of the Commission's responsibilities.

The intervening lines contend that the Commission's concern is limited to the competitive effects of the merger[9]—to the balancing of antitrust policies and transportation benefits; that the details that ultimately will be disclosed in the plan of corporate reorganization cannot have any possible bearing upon the degree to which the merger affects competition or the nature of the transportation benefits to be derived from it.

The Commission, however, is not free to accept these assumptions. By virtue of the legal consequence of its approval it has, in effect, been designated by law as the agency responsible for governmental acceptance or rejection of the reorganization plan itself. The dimensions of its function must coincide with those of its responsibility.

The intervening lines assert that an insistence that details of the reorganization be completed before Commission approval can be secured would in an industry as unstable as shipping, be a practical bar to any merger and thus, through elimination of a possible public benefit, actually result in a contraction of the statutory jurisdiction.

■ From the Alexander Report, however, it is clear that cooperative working agreements, due to the fact that they accommodate change and continuing Commission supervision, are to be preferred over mergers. Although consolidations and mergers may, on balance, be tolerated in the public interest they are not favored. See United States v. Third National Bank in Nashville, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968). The very instability of the industry (advanced by intervenors as a fact in their favor) would suggest that an arrangement found acceptable today may tomorrow be found destructive of competition.

■ The uncertainty of ultimate governmental approval and the risk that elaborate and expensive preparations will go for naught are facts of life in the field of corporate reorganization. We find no strength in the argument that the shipping industry should be made an exception and that the Commission should be called upon to bind itself prospectively in order to encourage a result Congress sought to avoid by providing alternatives.

■ We see no reason, however, why the giving of advance reassurance should not be within the Commission's power. Such a hearing as was had here would seem to be an appropriate step in the supervising process of the Commission. We here hold only that approval cannot be more than tentative at this stage; that any reassuring interloctory conclusions are without finality until reexamined on consideration of the arrangement itself.

*Merits of the Merger Approval*

It necessarily follows that the conclusions reached by the Commission are

---

8. But see United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 77 S. Ct. 872, 1 L.Ed.2d 1057 (1957) ; § 11 of the Clayton Act, 15 U.S.C. § 21 (ICC, CAB and FCC empowered to order divestiture of stock and assets).

9. In this respect we note that the Commission has in the past, with Supreme Court approval, interpreted "public interest" to include factors other than purely competitive considerations. FMC v. Svenska Amerika Linien, 390 U.S. 238, 247, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968).

not yet subject to our review. It must be understood that our failure for this reason fully to discuss them can in no respect imply approval. To the contrary, we are left in serious doubt in two important respects. Since our doubt in both respects stems in large part from decisions of the Supreme Court handed down this year after the Commission's order was entered,[10] we feel that fairness to the Commission, the petitioner and the intervenors requires their mention. The Commission may well wish to re-examine its conclusions in the light of the new authority.

The question is presented whether the threat to competition posed by the merger and the consequent interference with antitrust policies is of sufficient substance [11] to bring into play the requirement that it be justified by a serious transportation need or important public benefits.[12]

A second question is presented whether, under any standard, resort to merger is justified in the public interest when the only benefits that cannot as well be achieved by less restrictive and more flexible means (such as cooperative working agreements) would appear to redound to the stockholders rather than to the public.

The Commission's order of December 26, 1967, in docket No. 66–45 is vacated and set aside. The matter is remanded to the Commission for further proceedings.

**JAMES M. CARTER**, Circuit Judge (dissenting in part, concurring in part).

Judge MERRILL has written a workmanlike opinion in a difficult case. But I cannot agree that under Sec. 15 of the Shipping Act of 1914, 46 U.S.C. § 814 (1964), Congress has given the Federal Maritime Commission jurisdiction over mergers or merger agreements of the type involved in this case. The majority has set forth in the opinion, (pp. 3–4) the contentions of Matson as to lack of jurisdiction and has footnoted the authorities and material on which Matson relies in notes No. 3 to No. 7 inclusive.

The United States also asserts that F.M.C. lacks merger jurisdiction. It argues that where Congress has carved out an exemption from the antitrust laws, the exemption should be strictly construed, United States v. McKesson & Robbins, 351 U.S. 305, 316, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); that the Supreme Court will "not assume that Congress having granted only a limited exemption from the antitrust laws, nonetheless granted an overall inclusive one," California v. Federal Power Commission, 369 U.S. 482, 485, 82 S.Ct. 901, 904, 8 L.Ed.2d 54 (1962); and to like effect Carnation Company v. Pacific Westbound Conference, 383 U.S. 213, 218, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); United States v. Philadelphia National Bank, 374 U.S. 321, 350–351, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). It contends that the statutory langauge of

10. Penn-Central Merger Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968); United States v. Third National Bank in Nashville, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968); FMC v. Svenska Amerika Linien, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968); Volkswagenwerk v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

11. The merged line would, in trade with the Far East, carry 26.1 per cent of liner commercial cargo, a market area already characteristically oligopolistic. See United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); United States v. Von's Grocery

Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L. Ed.2d 555 (1966).

12. The Commission was of the view that this high standard need not apply in absence of a per se violation of the antitrust laws. To support its view it cited the decision of the Court of Appeals for the District of Columbia in FMC v. Svenska Amerika Linien, 351 F.2d 756 (D.C.Cir. 1965), reversed by the Supreme Court this year (supra, footnote 9), and its own decision in Mediterranean Pools Investigation, 9 FMC 264 (1966) which, as we read it, applies the standard in question to "all anticompetitive combinations" rather than limiting it to per se violations.

Section 15 (46 U.S.C. § 814 (1964)), read in context, shows no intention to include mergers and compares the express authority to approve mergers contained in the Interstate Commerce Act, Sec. 5(2), 49 U.S.C. 5(2) (1964), the Federal Aviation Act of 1958, Sec. 408, 49 U.S.C. § 1378 (1964) and the Federal Communications Act of 1934, 47 U.S.C. §§ 221, 222 (1964). The United States also contends that the legislative history concerning Section 15 makes clear that Congress did not intend to include the power to approve mergers, calling attention to the Alexander Report, H.Doc. No. 805, 63rd Congress, 2nd Sess.

It would serve no purpose to discuss in detail the contentions above set forth. The position of Matson and the United States as to F.M.C.'s lack of jurisdiction over the merger appears clearly correct.

Volkswagenwerk v. F.M.C., 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968) as the majority correctly points out, did not deal with a merger. The case dealt with a "cooperative working agreement," one of a "myriad of restrictive agreements in the maritime industry" (p. 276, 88 S.Ct. p. 937) and one clearly within the scope of the Alexander Report. The case cannot be read to go the whole route and authorize F.M.C. to approve mergers of great shipping corporations.

If F.M.C. has jurisdiction over mergers and merger agreements, then clearly the majority is correct that F.M.C. was premature in approving the "agreement to agree" on a merger. If jurisdiction exists, then the case must go back to F.M.C. for further hearings when an agreement is reached and has specificity and finality.

The majority is correct in its section on "Matson's Standing to Seek Review" and, if jurisdiction exists in F.M.C., in its sections on "Finality of the Agreement" and "Merits of the Merger Approval."