**PACIFIC COAST EUROPEAN CONFERENCE and its member lines, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents.**

No. 74–2509.

United States Court of Appeals, Ninth Circuit.

April 29, 1976.

Rehearing Denied July 16, 1976.

David C. Nolan (argued), San Francisco, Cal., for petitioner.

Edward G. Gruis, Deputy Gen. Counsel (argued), Federal Maritime Commission, Washington, D. C., for respondents.

Before CHAMBERS and GOODWIN, Circuit Judges, and SWEIGERT,* District Judge.

ALFRED T. GOODWIN, Circuit Judge:

The Pacific Coast European Conference (PCEC) petitions for relief from a cease-and-desist order of the Federal Maritime Commission entered under the Commission's statutory authority to regulate transportation rates.

The controversy arises out of the sale of cotton in 1972 to a purchaser in Spain. Spanish law apparently required the purchaser to ship the cotton on Spanish vessels. The exporters accordingly sold the cotton f. o. b. a Pacific port and title passed to the purchaser who then caused the cargo to be shipped on a Spanish carrier.

* The Honorable William Thomas Sweigert, United States District Judge for the Northern District of California, sitting by designation.

■ The PCEC is a shipping "conference". A "conference" of water carriers is a voluntary cartel regulated by the Commission,[1] and because of that regulation is immunized from antitrust liability.[2] Subject to Commission approval, a conference of carriers can agree to limit competition among themselves and can agree to deal uniformly with their customers (the shippers). 46 U.S.C. § 814 (1970).

■ One of the significant advantages of membership in a conference is the "dual-rate contract". This type of contract, between a conference and a shipper, provides a preferential rate (up to a 15% discount from standard rates) to shippers who agree to give exclusive patronage to members of the conference. Dual-rate contracts provide penalties[3] if the shipper uses a nonconference carrier.

One of the recurring difficulties with the dual-rate contracts is the "f. o. b./f. a. s. problem". The exporter-shipper of goods must, under a dual-rate contract, give all its shipping business to the members of the conference. But sometimes a buyer takes title to the goods at the exporter's dock or plant. In these cases, the buyer has the legal right to select the carrier. Therefore, by simply changing the terms of shipment from c. & f. or c. i. f. (exporter pays the freight) to f. o. b. or f. a. s. (buyer pays the freight), the parties to the sale can predetermine who becomes the "shipper".

Obviously, flexibility can invite abuse. The exporter whose plant is located in a conference port will sign the dual-rate contract to obtain the preferential rates; but when it suits the exporter's purposes (e. g., to make a competitive sale), the exporter may allow the buyer to take title (f. o. b. or f. a. s.) and then stand by while the buyer directs shipment via a nonconference carrier. The buyer, not being a party to the dual-rate contract, cannot be penalized. The exporter, even though a party to the contract, has not breached the contract because the exporter was not legally the shipper. Economic incentives cause all parties to watch these situations carefully.

Congress was aware of the f. o. b./f. a. s. problem when it recently amended § 14b of the Shipping Act[4] to permit dual-rate contracts. Congress required the Commission to approve only dual-rate contracts which contained a "legal rights clause". The "legal rights clause" holds the exporter-shipper responsible for breach only as to those goods over which it has the legal right to select the carrier. The legal rights clause also provides that if the exporter divests itself of its "legal rights" in order to avoid its contract obligations to the conference, the shipper will be deemed to have breached the dual-rate contract. Section 14b(3) of the Shipping Act, 46 U.S.C. § 813a(3). Such breaches, of course, are difficult either to prove or disprove.[5]

1. Section 15 of Shipping Act, 46 U.S.C. § 814 (1970). *See also United States v. Pacific Coast European Conference*, 451 F.2d 712 (9th Cir. 1971).

2. However, the immunity is only coextensive with proper regulation. *See Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 932, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966); *Matson Navigation Co. v. FMC*, 405 F.2d 796, 798 (9th Cir. 1968).

3. "Penalties" may include either liquidated damages or consequential damages and the loss of the discount for shipments subsequent to the breach and prior to payment of such damages.

4. In 1962 Congress amended the Shipping Act and authorized the Commission to regulate dual-rate contracts. P.L. 87–346, 75 Stat. 762 (1961). The House and Senate Reports dis-

cussed the f. o. b./f. a. s. problem and the statute directly addressed the problem. P.L. 87–346(1). S.Comm. on Commerce, *Steamship Conferences and Dual Rate Contracts*, S.Rep. No. 260, 87th Cong., 1st Sess. § 3 (1961), in 2 U.S.Code Cong. & Admin.News p. 3119 (1961); H.Rep. No. 498, 87th Cong., 1st Sess. 9 (1961), in 2 U.S.Code Cong. & Admin.News p. 3119 (1961). *See* Antitrust Subcommittee, House Comm. on the Judiciary, *The Ocean Freight Industry*, H.Rep. No. 1419, 87th Cong. 2d Sess. (1962).

5. The Commission has permitted conferences to include an optional presumption in their contracts, which reads as follows:

"* * * [The exporter] shall be deemed prima facie to have the legal right at the time of shipment to select the carrier for any shipment.

The PCEC has resisted, and the Commission has encouraged, efforts to expand use by exporters of the legal rights clause. *The Dual Rate Cases*, 8 F.M.C. 16 (1964), *aff'd on other grounds, Pacific Coast European Conference v. United States*, 350 F.2d 197 (9th Cir. 1965), *cert. denied*, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965).

In 1970, the PCEC circulated a "Notice to All Contract Shippers", which stated that the preferential rates would apply "only to shippers whose cargoes are tendered to Conference vessels, exclusively." The notice also interpreted the standard dual-rate contract between the conference and its shippers to apply to all shipments, without regard to the shippers' "terms of sale, whether FOB, FAS, C&F, CIF or otherwise." In 1972, the PCEC "advised" its 4,000 contract shippers that "shipment on any vessel of * * * [a certain non-conference carrier] will constitute a violation of the shipper's obligations under * * * [the contract]." Neither of these notices called attention to the "legal rights clause" of the standard dual-rate contract used by the PCEC and approved by the Commission.

The f. o. b. cotton carried by the Spanish carrier triggered this litigation. The exporters contended that the Spanish buyer had insisted on selecting the carrier. They asserted their good faith. The PCEC on the other hand claimed that the shipment constituted a breach of contract and demanded payment of damages. Until the damages were paid, the PCEC contended, the allegedly offending exporters would not be granted the preferential rates for shipments on PCEC vessels.

The exporter complained to the Commission, and the Commission, *sua sponte*, issued a show-cause order. The Commission ordered the PCEC to show cause (1) why the dispute should not have been submitted to arbitration under § 12 of the contract; (2) why the PCEC should not be ordered to

cease and desist from suspending or threatening to suspend its dual-rate contract with the allegedly offending exporters; and (3) why the Commission should not disapprove the PCEC's standard dual-rate contract for failure to abide by § 14b of the Shipping Act.

After a hearing, the Commission issued a report and ordered: (a) that the dispute be submitted to arbitration, (b) that the PCEC not suspend or threaten to suspend the contract rates for any offending exporter pending the outcome of the arbitration, (c) that the PCEC cease and desist from issuing misleading "Notices" interpreting the dual-rate contract, and (d) that the PCEC's standard dual-rate contract would not be disapproved at present but that the Commission would retain jurisdiction of the matter and would consider further action if the PCEC did not abide by the order of the Commission.

The PCEC complains to this court that the Commission has overstepped its authority, has issued an illegal order, and has followed neither its own procedure nor that required by the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* (1970).

The PCEC asserts that the Commission has the power to approve or disapprove a dual-rate contract, but not the power to command "specific performance" of the contract or to issue an "interlocutory injunction." The PCEC contends that contract law should govern the dispute, *i. e.*, that the PCEC can abrogate its obligations under the contract if the shipper materially breaches the contract first. Restatement of Contracts, § 274 (1932).

The PCEC represents in its brief that it will refund any excess charges it has collected if the shippers prevail in the arbitration. The PCEC has also offered to put the excess charges in escrow. Having advanced these indicia of good intentions, the PCEC contends that it is entitled to the self-help

---

(a) with respect to which * * * [the exporter] arranged or participated in the arrangements for ocean shipment, or selected or participated in the selection of the ocean carrier, or

(b) with respect to which * * * [the exporter's] name appears on the bill of lading or export declaration as shipper or consignee." 8 F.M.C. at 31.

remedies available to parties to conventional contracts, including abandonment of contract obligations in the face of a material breach by the other party.

The Commission concedes that the central issue is a private dispute. But the Commission views its order as an exercise of its powers under §§ 14b and 22 of the Act,[6] and, specifically, of those granted under § 14b(9).[7] The Commission characterizes its order as prohibiting conferences which have arbitration clauses in their dual-rate contracts from asserting unilateral prearbitration remedies.

## I.

■ The Commission has broad regulatory authority over dual-rate contracts. *Pacific Coast European Conference v. United States,* 350 F.2d 197 (9th Cir. 1965). Congress and the Commission have imposed substantial regulation upon the contracts made by the conference. The Commission can investigate alleged violations of the Shipping Act and make appropriate orders[8] with respect to any practice which the Commission is authorized to approve or disapprove. *Federal Maritime Commission v. Caragher,* 364 F.2d 709, 715 (2d Cir. 1966). Here, the show-cause order specified that the Commission was investigating the possibility that the PCEC was violating § 14b of the Shipping Act and that the Commission was contemplating an order disapproving the dual-rate contract entirely.

■ The Commission held that if the PCEC suspended the preferential rates (or

threatened to do so) pending outcome of the arbitration of the f. o. b./f. a. s. dispute, then such suspension (or threat) would constitute a violation of § 14b of the Act. This is an "interpretive" order which lies well within the authority granted to the Commission by Sections 14b and 22 of the Act.[9]

The Commission is equipped to regulate the exercise of economic power by a conference which is itself a creature of the Shipping Act. The PCEC should not be heard to complain about such regulation. The entire conference-shipper relationship is immunized from an antitrust attack by the very same regulation.[10] Without some regulation, there could have been no conference. The PCEC can escape the effects of some of the regulations it professes to abhor by withdrawing from the dual-rate arrangement.[11] "[The conference] has no right, constitutional or otherwise, to persist in a course which Congress[12] has now found to be discriminatory to shippers and violative of the antitrust policies." *Pacific Coast European Conference v. United States,* 350 F.2d at 203. (Footnote not in original.) We find no reason to question the Commission's interpretation of § 14b as prohibiting prearbitration suspension of preferential rates.

■ The PCEC contends that the order to cease and desist from suspending the preferential rates is an illegal interlocutory injunction, citing *Trans-Pacific Freight Conference of Japan v. Federal Maritime Board,* 112 U.S.App.D.C. 290, 302 F.2d 875,

---

6. 46 U.S.C. §§ 813a, 821 (1970).

7. 46 U.S.C. § 813a(9):
"* * * [T]he Federal Maritime Commission * * * shall * * * permit the use * * * of any [dual-rate] contract * * * provided the contract * * * expressly * * * (9) contains such other provisions not inconsistent herewith as the Commission shall require or permit * * *.

8. 46 U.S.C. § 821 (1970).

9. 46 U.S.C. §§ 813a, 821 (1970).

10. See note 2, *supra.*

11. The PCEC can withdraw from the business of offering dual-rate contracts, can cancel the

contracts on 90 days' notice, can petition the Commission for a change in its rules, and can petition for a different form of dual-rate contract. The PCEC forecasts dire consequences if this court affirms the Commission's view, but cites no reasons for this forecast.

12. In the "legal rights clause", Congress specifically legislated the balance to be struck between shippers and conferences regarding the f. o. b./f. a. s. problem. The Commission has interpreted this language to prohibit prearbitration suspension of preferential rates. *See generally* the Congressional reports cited in note 4, *supra.*

878 (1962). In that case, the Commission had ordered a conference to refrain from assessing fines against its own members pending disposition of the proceedings brought by the members against the conference. The Commission did not make a finding of violation of the Act, but only a finding of "irreparable injury." The court reversed on that ground. Here, however, the Commission made a finding that prearbitration suspension was a violation of the Act. The order here is not an interlocutory injunction.[13]

Neither is the order one for "specific performance" as the PCEC alleges. The order merely interprets existing remedial procedures of the dual-rate contract, and orders compliance with those procedures. The Commission did not exercise the powers of equity but rather exercised its power to regulate conference-shipper relationships.

■ And, finally, the PCEC is not correct in charging that the Commission's order is not authorized by the Shipping Act. Section 14b(9) evinces congressional intent to grant the Commission considerable latitude in regulating dual-rate contracts, and prelitigation suspension of preferential rates has been viewed by the Commission as a violation of § 14b since 1964. *See* 46 C.F.R. § 530.6 (1975); *The Dual Rate Cases*, 8 F.M.C. 16, 36 (1964), *aff'd on other grounds, Pacific Coast European Conference v. United States*, 350 F.2d 197 (9th Cir. 1965).

## II.

The PCEC raises three procedural irregularities which deserve comment.

■ The first is that the order is not "final" because the Commission retained jurisdiction.[14] The cease-and-desist order itself was in a final form, and was not, as the PCEC argues, an interim order. The

retention of jurisdiction does not make the prohibition "interlocutory". The retention-of-jurisdiction language is surplusage in any event because the Commission has continuing jurisdiction over the PCEC and the dual-rate contract. The presence of unnecessary language does not make the order interlocutory.

■ Second, the PCEC claims that the Commission violated § 8 of the Administrative Procedure Act, 5 U.S.C. § 557 (1970), by failing to state specific reasons in support of the finding that prearbitration suspension of rates violates § 14b of the Shipping Act. While the Commission's final "Report and Order" is not a literary landmark, it is passable bureaucratic prose; it discloses sufficient support for the critical finding.

■ Third, the PCEC claims that the Commission did not follow the dictates of § 22 that a "sworn copy of the complaint" be served on them. The PCEC overlooked the fact that formal service of a complaint is not necessary when the Commission acts *sua sponte*, which it did in this case.[15]

The general complaints about notice and opportunity to make comment on the final order are almost frivolous. The record shows that PCEC has had notice and has been in controversy with the Commission, and that the issues were clearly drawn. The show cause order was sufficient *de jure* notice for this controversy.

The petition to set aside the Commission's order is denied, and the petition is dismissed.

---

13. As for the "interlocutory" nature of the order, see text at note 14, *infra*.

14. The FMC Order, served November 20, 1973 stated:

"* * *.

"Further, it is ordered, That the record in this proceeding remain open pending the out-

come of the arbitration proceeding specified in our Report.

"* * *."

15. The Commission may continue an investigation after a private party withdraws; *see Anglo-Canadian Shipping Co. v. United States*, 264 F.2d 405, 411 (9th Cir. 1959).